Good morning, ladies and gentlemen. This is the time for the re-hearing on Bank, the case of the United States of America v. Thomas Cameron Kincade. I understand that all those who intend to present argument are present, and so the appellant may proceed. Thank you. If it pleases the Court, Monica Knox on behalf of Appellant Mr. Kincade, and I'll try to watch my time to reserve five minutes for Rebecca. In this case, this Court will decide not just whether DNA sampling of parolees violates the Fourth Amendment, but whether parolees have Fourth Amendment protections at all. And that is so because if DNA sampling, which is the forced extraction of blood followed by DNA profiling, satisfies the Fourth Amendment, it is virtually impossible to conceive of a search of a parolee that would not satisfy the Fourth Amendment. The question, though, has already been answered by both this Court and, more important, by the Supreme Court. In Griffin v. Wisconsin, the Court held very that even prisoners have Fourth Amendment protections. This Court has held the same as to both parolees and prisoners. DNA sampling is made possible by advancements in scientific technology. But the Supreme Court has addressed that issue, too, in terms of the Fourth Amendment. In Kiley, the Court said that just because we can now do something with technology does not allow us to erode the privacy guaranteed by the Fourth Amendment. There are five subsets to this issue, two of which the government and appellant clearly agree on, two that we clearly disagree on, and one that we may or may not agree on. The first two that we both agree on is that taking a blood and doing DNA profile off of it is a search that implicates the Fourth Amendment. Ms. Knox, suppose it weren't blood. Suppose it was hair. If it were a different item, the nature of the initial intrusion would be different but would still implicate Fourth Amendment protections. In Skinner, for example, the Court was dealt with both blood testing and with a breathalyzer. And the Court said that a breathalyzer, the intrusion would be a little bit different but would still be serious enough to implicate Fourth Amendment principles. So it would be different. More, it would be the still be a Fourth Amendment. But it doesn't make any difference if it were hair or a mouth swab or some other kind of biological. No. Anything from the parolee's body would not make a difference. It would still implicate the Fourth Amendment principles. How about fingerprints? Fingerprints implicate the Fourth Amendment principles when done for purposes of investigating, solving, or prosecuting crime. They don't when they're done for an administrative purpose such as a booking search. But in Davis, the Supreme Court held that if it's done for purposes of investigating crime, it implicates the Fourth Amendment, and therefore, there must be individualized suspicion in Davis. They actually held there needed to be probable cause. And so fingerprinting, they can't get a DNA profile from fingerprinting, but fingerprinting is different in the sense that it is done when it's done for an administrative purpose, that is, a booking search in order to allow the police to make sure the person they're booking is the person they think he is. It is the same when done for purposes of investigating, solving, or prosecuting crime. The other thing you don't distinguish between whether how the intrusiveness of it, then. They're all, they all implicate the Fourth Amendment? The intrusiveness of the search, obviously, taking fingerprints is a less intrusive search than the forcible extraction of blood. And, yes, there is a difference, and that becomes relevant when we get into balancing. But it is not necessarily relevant to the determination of whether the Fourth Amendment. There has to be an intrusion in order to implicate the Fourth Amendment. But the extent of the intrusion is not relevant to determine whether the Fourth Amendment applies or not. It may be relevant to determine what level of individualized suspicion there's going to be in order to allow the search. The more important issue here, though, is that the forced extraction of blood or whether they decided to do it a different way in terms of saliva or hair is not the only search or is not the full extent of the search that is done with DNA sampling. There is the DNA profiling that comes after that. In Skinner, for example, the Court talked about how the taking of blood was not the full extent of the search, that the chemical analysis of the blood to determine whether there were drugs or alcohol in the person's system was yet a further intrusion into the person's privacy. And so even if we decided to take it some other way, the DNA samples some other way, the DNA profiling part of the search would be exactly the same. And of course, in many ways, that's the most intrusive part of the search because it implicates the person's very private information, more so than the drug testing in Skinner or Acton or Earls did, because in those cases they were looking for only one thing, and that was whether there were drugs or alcohol in the system. We'll put you on parole, but before we'll do that, you've got to submit a blood sample. If what Your Honor is referring to is the issue of whether there were drugs or alcohol in the system, the issue of possible implied consent, that issue is, of course, pending before this Court, an en banc court in Crawford. It actually wouldn't apply in a situation like this because supervised release is an additional punishment to prison. It isn't that you get out of prison early in order to get supervised release, and so you could choose to stay in prison and therefore not have to give up your blood and your DNA. Supervised release is an additional punishment, and there's actually no way for parolees or prisoners to avoid this. If a parolee like Mr. Kincaid says, I won't give a sample, he is violated and sent to prison. When he's in prison, if he says, I won't give the sample, he is actually tied down and the sample is taken from him. And so there is no way to avoid it. And what if we're in the State system and prisoners are paroled every day? The condition of parole would be to give us a blood sample. They're not entitled to parole. They're not entitled to parole, and so it is theoretically possible that the – well, it's clear that the State can condition parole on some factors. It is theoretically possible that the State can condition parole on some factors. The issue of whether they could condition it on DNA sampling would be problematic because it's – it wouldn't be voluntary. You know, if – and this issue was discussed at length with some of you that were on the Crawford.com panel about whether that in fact was consensual for him to have to choose between I allowed – I agree that I can be searched at any time with or without cause by any law enforcement officer in order to get out of prison and not do more time. What if – what if the requirements were not that you give blood, but let's say that you're already giving blood for some other purpose. So let's say if you're a fellow in all the categories and went to the doctor and had to give blood. First, the doctor was required to give up a little bit of blood to law enforcement for putting this database. If the doctor – Or let's say you're in prison and you have a medical procedure, you know, whatever, and they say, okay, we're drawing blood anyway. We're going in, we're drawing blood anyways, and all we're doing is taking a little bit of our blood. Would you still have – Yes, you would still have a problem. First of all, in the context of a doctor outside prison, that's a search that you're consenting to, and so there it's not really a search because it's not done by the government, and so a biomedical doctor doesn't implicate Fourth Amendment principles. No, no, but the doctor is asked or required to give up some of the blood that's drawn for – So similar to Ferguson, the searches in Ferguson, where the hospital agreed that they would take the urinalysis from the – No, it would – Give it to the police? No. This is limited to – this would be limited to classified felons. Yeah, it was limited to pregnant women who were suspected by hospital personnel of being drug users in Ferguson, and the Supreme Court said, no, you can't do that. Counsel, I have a question. Is there a difference – in looking at the Rice case, the debate seems to be whether the three-judge panel was controlled by it or not controlled by it, and I'm wondering whether there's a distinction between someone who is actually serving time in prison as opposed to someone who has been released from prison and supposedly having paid his debt to society or being rehabilitated and assuming a more ordinary role in life. Do you make a distinction based on that at all? There is a distinction between the Fourth Amendment protections of prisoners and parolees. As to DNA sampling, no, I do not believe there is a distinction between them. Both the Supreme Court and this Court have held that prisoners and parolees give up or have lesser Fourth Amendment protections only to the extent that it serves the purpose of either prison or supervision. DNA sampling does not serve any legitimate purpose of either prison or supervision. DNA sampling is not – Isn't there a panological purpose in having a system that would deter future crime or that would give a greater chance of apprehension if there's a future crime? There is not a legitimate panological interest that has been identified either by this Court or by the United States Supreme Court that would allow for a search in order to help solve future crime. But why isn't there a special need for the government to have a system to deter future crime from the most likely recidivists? Well – Well, it's not – it's not general law enforcement in the sense of trying to use this for past crimes, although that might happen. But don't they have a special need? It is general law enforcement. The United States Supreme Court has identified general law enforcement as a – Have they ever said that general law enforcement applies to future crimes? I haven't seen any Supreme Court case where they were talking about that. I've seen cases where they referred to general law enforcement and they're talking about enforcing the law as to a past act. Is there a case that addresses the future? With all due respect, I would disagree with that. The special need cases almost always are to prevent a harm, not to clean up after the harm has been committed. We drug – the Supreme Court has allowed the drug testing of student-athletes because we're trying to prevent the harm caused by it, not because we want to clean up after the harm has already been committed. But where is the – what is the case you think from the Supreme Court supports or involves saying that general law enforcement relates to future crime and that special needs can't address that? Is there such a case? Well, I'm not sure the Supreme Court has ever used that terminology. But as I just pointed out, in many of the special needs cases, what they were doing – what they were seeking to do was to prevent the harm in the future should it occur. So it was the future that they were looking at. Well, if we could identify the people who are most likely to commit crimes in the future, people who live in low-income minority communities, people who come from broken homes, people who have had very little education. Or stockbrokers, you know. Yeah. Could we not give those people these tests to make sure that we'd have a good leg up on them when they committed crimes in the future? Because they're the most likely criminals in the future, the economic class. Of course. And certainly if this Court upholds DNA profiling of parolees because they are, in fact, at risk or more likely to commit a criminal offense, it, of course, opens the door wide to what other classes are likely statistically to commit a criminal  Is profiling an issue? Excuse me? Is profiling an issue? What I mean by profiling is the DNA profile they do after the – of the blood that they take. And I'm sorry, I don't understand what you mean, is it an issue? Profiling as in low-income neighborhoods, as in given ethnic groups. Oh, no. I was talking about the DNA profiling when I just used the word profiling. Counsel, am I correct that this statute applies to all persons who are convicted of certain designated crimes? It's not just applicable to parolees. It's not currently, but the Attorney General of the United States has the right to broaden it at any point. And I would also note that even more important than the Attorney General's right to broaden it at any point is if the concept is that parolees are more likely to commit an offense or that they have lesser Fourth Amendment protection, then it really doesn't matter what the statute says. I'm sorry. But my question went to the fact that all of these people have been convicted of one of the – The statute before this Court does involve people who have been convicted. All the State statutes do not. And there are many people who have been convicted of sodomy in the military, including people who have been convicted of sodomy in the military. Yes, sir. It includes a lot of people. There are also – Is the terminology, though, a violent felony offense? No, there are other offenses that are not violent offenses that are covered by the statute before the Court, including a conspiracy to commit a burglary is covered. So there are a lot of offenses that are not violent that are covered. But I think it's important to realize that the statute, if it stands up, is only the floor. If the concept is that we can DNA sample parolees because they're either at higher risk or they have less Fourth Amendment protections, there is nothing that stops the police officer from walking up to somebody who's on parole for the most trivial offense and require him to give a DNA sample. But that isn't – but you get on – you only get on parole after you go to prison and you've been convicted of a felony, right? So we're not talking – I mean, we're not – I should have been more clear. I thought I was – You're talking about parole and probation. Parole – I'm just using the term. There are different types of criminal supervision. There's obviously probation. There's parole. There's supervised release. I was using parole just for ease of simple – for ease of reference. Well, but if the person that stole a loaf of bread or stole the 99 cents of medicine from Wong, is that person going to fall into this category? Is he covered by the DNA Backlog Elimination Act of 2000? Not currently. Well, why should we – Is he covered by some state statutes? Absolutely. Well, why should we address anything other than the statute before us? Well, the statute before you is the narrow issue that is before you, but the implications of this statute are clear. The only way to get to the holding that the government wants you to get to, which is that the forced extraction of blood for DNA profiling is constitutional, is to hold that parolees do not have sufficient Fourth Amendment protections to prevent them from – to allow them to say, no, I won't give my blood and I won't give my DNA. What if the statute – you said there's no legitimate reason to – parole-related reasons or probation-related reasons for imported or forced extraction of blood. But, you know, there could be. For example, in prison, sometimes they get into a prison situation. In fact, it would be nice to know whose blood it is. Sometimes prison guards get there and don't observe everything. And there are lots of restrictions we impose on parolees and people on supervised release, sometimes ankle bracelets, sometimes reporting requirements, drug tests, bed searches, all sorts of things, that we don't allow people who are not on supervised release or probation because we suspect they might be recidivists. They might – precisely because we think they might commit additional crimes. So if the statute really were here to say, look, this is just one more measure to keep parolees – let's call them parolees – from straying while on parole, that would clearly fall within the special needs cases, wouldn't it? And let's say the statute – and then when they're off parole, you destroy the record. You destroy it? Well, of course, that's one of the things that they don't do. No, no, just follow me along. Let's say they say, look, this is like the ankle bracelet. We keep it on or bed checks while on parole. And then when you're done, we destroy the record. It's still not a supervisory reason. Supervision is intense observation. And the conditions that we put on – and incidentally, there are virtually no conditions of supervised release, parole, or probation that are by law apply to everybody. We allow those to be done at either a judge's or at a parole officer's discretion. There is no constitutional requirement of that. Congress could say everybody who is on supervised release, whether they are a convict with any kind of serious crime or anything, will be subject to drug tests. As part of the punishment? Yes. As part of punishment, I think they could do that. But, of course, then Mr. Kincaid wouldn't be subject to that. They could say that's what they're going to do. They're going to be subject to this requirement because we think they are likely to be taking drugs while on parole. You do have to concede that if this were limited to the parole period, it would be okay, wouldn't it? No. I don't concede that. But it would be a much harder case, wouldn't it? It would be a different case, and I suppose harder, because once you're off parole, then you have the same Fourth Amendment protections that anybody has. But I still don't think it's a close case. The Supreme Court has held that they have Fourth Amendment protections. This is not done for supervisory purpose. Look at the history of this law. Look at the face of the law. The government's brief is half-filled with an argument that the purpose of this law is to investigate, solve, and prosecute crime. The meekest brief filed by the attorney generals of the nine states in support of the government's position says on every single page that the purpose of this law and the need for this law is regular law enforcement. But aren't they talking about law enforcement if there's a future crime? And isn't that a critical distinction between requiring this to solve past crimes versus requiring it so you have a mechanism to deter future crimes or solve them if they occur while someone is within the penological system? These people are within the penal system when they're on suspended release. They are. But isn't there a penological interest if someone who's on supervised release commits another major crime, isn't there a penological interest in apprehending them? No. There is a penological interest. There's a penological interest, and that is a supervisory interest, in trying to prevent him from committing a crime. Catching him after he commits the crime is a law enforcement issue. Right, but before he commits the crime, before the crime is done, isn't it a supervisory interest to have a system that will deter the crime? And that can include if you do a crime while you're on supervised release and you leave your DNA, you're likely to be apprehended. And isn't the supervision made stronger by the likelihood being greater because of the availability of DNA testing? Supervision isn't made stronger. Supervision is a parole officer supervising, finding out all the things that we associate with risk factors of likely to return to crime. Unemployment, drug use, who you're hanging out with, all the things that you couldn't be made to tell a police officer or a government official, but we make parolings tell government officials because we're trying to identify when they're on the road to criminal behavior. The United States Supreme Court has said that supervision is, in fact, a special need. And so there are circumstances that, like I've just described, where we are going to make somebody on supervision give up things that we wouldn't make somebody not on supervision give up. That puts it clearly, supervision, in the context of special needs. And I don't see that permitted. Why isn't specific deterrence, why isn't specific deterrence of people on supervised release a special need? Why can't it be? Before they do the crime, specific deterrence is not law enforcement after the crime. It's an attempt, like the parole conditions or conditions of release, to stop them from doing a crime again. Okay. There are a number of reasons. I'd like to start out with what I consider to be the most important reason, which is that even if it were a special need and it were, it did set this scheme satisfied deterrence factors, it would not qualify as a special needs search, because what Edmund and Ferguson teaches us is that we have to look to the programmatic reason for the search. The programmatic reason could not be any clearer than that it is law enforcement in the DNA sampling context. That's okay while they're on probation or parole or supervised release. That's why we make them come in and give a urine sample, because we want to make sure that they're not out there using drugs, not past conduct, that in the future or in the present they're not doing it. That's why we can say you come in and you call in every day and the day we tell you, by surprise, you come in and give us a urine sample, you have to come in and give us a urine sample. Isn't that designed exactly to do what Judge Gould was asking about, which is to engage in specific deterrence of a particular kind of crime? That is, in that case, the crime of using drugs. In this case, it would be the kind of crime that can be detected by DNA. No. No? No. It is the same to the extent there is a deterrent value to drug testing. You're not challenging drug testing, right? I am not challenging drug testing, and it's important to understand why. I don't challenge drug testing because there is a supervisory reason for doing that. We know that people who use drugs are more likely to commit offenses, and so it is related to the purpose of supervision. In Griffin, the Court drew a distinction between something related to supervision done by a parole or probation officer and something related to the solving of criminal investigations done by an officer, a police officer. Ms. Nelson, I have a question on the ‑‑ we do keep referring to supervised release and parolees, but it also applies to people who are on probation. Would this apply to someone who, say, was in criminal history category 1 with a low offense level, zero to six months, so that the district court judge could just put them on probation with some short period of supervised release? Would that person, if it were a conspiracy to commit burglary or attempted burglary, come within this statute? Yes. Yes. You've used all but three and a half minutes. Thank you. I thought we were going to have a microphone. Abel. Good morning. May it please the Court. Jonathan Marcus on behalf of the United States. The collection of DNA from convicted offenders in the criminal justice system is constitutional under the Fourth Amendment. Approximately nine years ago, in Rise v. Oregon, this Court reached that very conclusion, upholding a state law requiring a subset of convicted offenders sentenced to imprisonment or probation to provide a DNA sample via a blood draw. Why blood? Sorry? Why blood? Why is the FBI collecting blood? Why blood as opposed to mouth swab, whatever. The FBI has determined that blood provides the most reliable, dependable form of DNA. In a report submitted to Congress before the DNA Collection Act was enacted in 2000, the FBI explained to Congress why it was planning to collect blood. And the reason is, the most important reason is the redraw rate that you have with taking buckles, what's so-called buckle swabs from inside the cheek. The statute doesn't require it, does it? The statute does not require it. It permits the decision made by a law enforcement agency. Yes. Yes, it was. The statute leaves a, it does not define how it has to be taken. It says a sample, a bodily sample fluid, and so it could be, or tissue, so it could come. It could be the root of a hair. Yeah, but that's, it's not feasible right now. There's, you can't get enough, you can't get enough of a DNA sample to do the, to do the testing that they do on the 13 coralloci. Extensive testing, but a root of a hair actually produces a certain range of identifiable DNA so that you could identify a person with that. We just had the State of California argue that to us recently. Okay, well my. Is that wrong? My understanding from the FBI is that is not a feasible, not a feasible collection method at this time. It does not provide a dependable enough sample. So only the most intrusive method is the, is feasible in the FBI's view. Yeah, and yes, and one of the, the FBI. One of the most enduring images of the last year was the arrest of, or the apprehension discovery of Saddam Hussein and the image of a medical technician swabbing the inside of his mouth. If that's good enough for the most notorious mass killer of the last 40 or 50 years, why isn't it good enough for the FBI? Well, I mean, the issue here is the numbers. I mean, you're talking about a large number of individuals. The FBI, especially for the Federal Government, there are over 600 collection sites nationwide between all the probation offices where samples are collected and all the Bureau of Prisons sites. And so the redraw rate becomes a really important factor for the Federal Government. And because of so many different sites and because of the high redraw rate with the buckle swab, they have decided that that's not a feasible option at this time. Although they, you know, if the technology comes along so that when they're at the collection site, they can determine at the collection site that they're collecting a sufficient amount of DNA so it can be analyzed properly, the decision could change. But the short response that it makes law enforcement's job easier? Well, I wouldn't put it that way. I mean, it's just – What's incorrect about that statement? Well, I think it's – there would be – certain things would be lost. It's not just easier. I mean, if they had to – because of the high redraw rate, you might have people that would actually leave the system before the sample could be recollected. And it's also inconvenience to the offender as well, having to come back for a second draw. So – but the bottom line is, while you can dispute whether it's more intrusive than a buckle swab, the bottom line is it is not. It is still minimally intrusive considering all the circumstances. And the fourth thing, the four factors I think this Court should keep in mind in analyzing the – Do we have the technology to preserve saliva samples? Yes, I don't think that's the issue. The issue, again, is with the – at the collection site, not being able to determine at the collection site that the buckle swab gets a sufficient amount of DNA that can be analyzed. So it's not a storage issue. The problem is at the collection site at this time. What are you basing that on? I'm basing that on my understanding in discussions with the FBI and reading – Is that in the record? And reading – well, there's a report that the FBI submitted to Congress in response to the Coverdell Amendments, which wanted the FBI to lay out basically what its plan was in connection with collecting samples from convicted offenders. Is that in our record? That is not in the record. I can supplement the record with that if the Court would like. Is that what this case is about? Well, I don't – I mean, our position is that – and I was trying to get into that – is that blood draw – the blood draw is a minimally intrusive technique. The Supreme – there are four – and there are four basic reasons. First, the Supreme Court has identified in a number of different contexts that blood draws are minimally intrusive, both in the criminal law enforcement context and also in special needs cases such as Skinner, where the Court said that blood draws do not infringe significant privacy interests. The Court has repeatedly said that it's a commonplace and routine procedure that millions of Americans are subjected to on a daily basis. And so for that reason – that's the first reason. And the second reason is to consider what's the group of people who are having the blood draw. The group of people here are probationers, in this case, defendant Kincaid, who are subject to a range of restrictions and infringements based on the fact that they have committed an offense and are on probation and under supervision. They have a diminished expectation. All those restrictions end when the status ends, the debt checks, the requirement to provide urine samples, having to report to your probation officer. There's a whole range of restrictions. And they all end the day the person goes off to provide solace. Whereas this is specifically intended to continue well into the future. That's correct, Your Honor. I think – That doesn't make a difference. Well, I don't – I mean, I think the important point is that the intrusion that's occurring, the intrusion – That doesn't make a difference. The only – the only – the only cognizable – It does make a difference. For the Fourth Amendment analysis, I don't think it does, Your Honor. I don't think it makes a difference because the intrusion, the relevant intrusion, is the – basically is the blood draw, which is occurring while the person is on probation. If the officer said they're having to come for the rest of – you pay off supervisor the lease. We can call him any time, day or night, and he has to come provide the urine sample. That would be the same, too. That would be no different, either. Yes, Your Honor. I think – I mean, the important point is that – We'll come to your house and get it. You don't even have to come to us. We'll knock on the door and ask – hand you a pot, hand you a beaker, and say, give us a urine sample 20 years out, 30 years out. Oh, when you're no longer on probation? Yes. No, I don't think that's – I mean, that would – that would be very different. Well, why would that be very different? Because all that's being retained is the DNA profile in the computer database. That's – I mean, the same thing could be said about fingerprints. Fingerprints, where the justification, the administrative justification for taking them when someone's booked, that doesn't – no court has said that they then have to basically give the fingerprints up. They're put into a national database and used for future criminal law enforcement purposes. I mean, here, the interest that all that the blood draw is getting in the system that has been set up with the DNA Identification Act of 1994 and the 2000 Collection Act is a DNA profile deriving from the blood draw, only an identification profile. And a probationer does not have a reasonable expectation of privacy in what – in what that blood draw reveals. Mr. Marcus, as I understand Ms. Knox's argument made a few minutes ago, she's more concerned about the alleged intrusiveness of the evaluation of the sample, the analysis that kicks out a lot of detail, which might not necessarily come from a fingerprint. And perhaps if I understood her correctly, she seems to suggest, well, it's really not so much the blood draw, it's what happens afterward. What's your response? Well, I think some of the amici made that argument, and I don't think that's persuasive at all. I mean, all the – in fact, I mean, if there is – the difference between this and fingerprints, it does occur at the, you know, at the collection stage. There is a difference. It is a more significant intrusion than taking a fingerprint. But the end product, the result, the DNA profile, is real – is no – is not any different from a fingerprint. It's the fact that it's a genetic fingerprint, an identification fingerprint that reveals no other information than the offender's identity. And there are all kinds of protections built into the statute. Given that, given that, that it's just stored for future use, what – what is the supervisory purpose of taking the DNA profile? Well, just because it's – I mean, you combat recidivism for a long time doesn't mean you don't want to combat it while the person's on supervised release. I mean, there's clearly – there's clearly – Isn't combatting recidivism a law enforcement purpose? It's not a purpose to ensure that the person who's on probation or supervised release is sticking to the conditions of release and isn't doing the – engaging in the kinds of behavior that might lead them to commit another crime. Combatting recidivism is a law enforcement purpose. Now, that's not to say that it's not – I mean, under the special needs doctrine, you can have a law enforcement purpose. It just has to be a law enforcement purpose that's other than – that's beyond – as the doctrine says, beyond the normal need for law enforcement. I'd like to say, though, that for – you know, our position first is we're not relying on the special needs doctrine. We don't believe you have to get to the special needs question. That's something that you have to reach in cases when you're dealing with ordinary citizens. The Supreme Court made clear in United States v. Knights that when you're dealing with offenders in the criminal justice system, the state's very interest in law enforcement can focus on probationers in a way that it cannot on the ordinary citizen. So – You didn't say you can do it without reasonable suspicion, did you? That case involves – the facts in that case involve reasonable suspicion, but I don't think that's a – Your Honor, with all respect, I don't think that's a fair reading of the case. I didn't give you a reading of the case. I just said they did not say in that case that you can do it without reasonable suspicion. Well, but what the Court did say – They said there was a reduced level of privacy, not none. Correct. There's a substantially reduced expectation of privacy, and the Court said that because the state can reasonably believe that offenders in the criminal justice system are more likely to commit crimes than people who are not, that the state's interest in law enforcement, law enforcement practices can focus on probationers in a way they don't on ordinary citizens. And they said that you don't need probable cause, reasonable suspicion was enough in that case. Let me ask you another question. Do you have any knowledge or any evidence that taking DNA samples has ever deterred a single person from committing a crime? I don't have any empirical evidence, Your Honor, but I think it's a logical conclusion you can draw from the – from the policy. Has the rate of recidivism been reduced in places where they've taken DNA? No, we make no such claims. It's more of a reasonable, if just kind of a common sense thinking about this restriction that some people on probation might decide that – might think about the fact that they could more – that they're not going to be able to conceal certain evidence that they might leave at a crime scene, that the government's going to have it. It might make some think twice about committing another crime. I think it's a logical conclusion to draw. Just send them off. They go back to the old environment. We don't really try to help them the way they do here on Delancey Street. Just put them out, you know. They've got no place to go. What are they going to do? It is suggesting people who aren't deterred by the threat of capital punishment, three strikes, being sent to jail for life, they're going to be deterred if they know that we have their DNA. Well, I think – I think that some – I think some offenders probably will be deterred, Your Honor. I'm not – but I don't think it's necessary to our position. I mean, obviously, the most important purpose of the law is to combat recidivism and to – and to quickly identify an offender when he does commit another offense and thereby protect public safety by getting him off the street quickly. And also, it affects rehabilitation. Isn't there a public interest in also having DNA to vindicate people who have been falsely accused of crime? Very much so, Your Honor. And this – I mean, there are already examples of that. There was a recent case in Virginia where the governor pardoned someone after – who had been convicted of murder. Does this statute allow people voluntarily to be tested for DNA to prove their innocence? Is there anything in the statute that benefits innocent people who would like to have it? Or is this only a compulsory statute? But the compulsory statute absolutely is to the benefit of innocent people in several ways, if you let me explain first. My question was, can innocent people take advantage of this statute who say, I've been accused of a crime? See, here's a government-assisted system. Does this statute permit voluntary testing by people who want to? Well, several states have those regimes, and there's legislation pending in Congress that's addressing that. But this statute has nothing to do with that. This statute, no. It doesn't address that. But it does benefit innocent people, both because by identifying the correct offender, innocent people won't be wrongfully investigated or suspected. And it also, again, with – sometimes you have someone whose DNA doesn't match a crime scene, but that doesn't automatically mean they're going to be exonerated. There still might be a belief that they just didn't leave DNA at the crime scene. But if you get a hit to a convicted offender, that often will be the conclusive proof. And I was giving the example of an offender in Virginia who was recently pardoned after there was a hit on the database to a convicted rapist, and it was that that kind of pushed the case over the edge. Before, when his DNA didn't match the crime scene, he had not been released on that basis. He was only released after there was a hit to a convicted offender. I'm so concerned with the exoneration of innocent people that it broadens the statute. It says, look, whenever somebody has blood drawn anywhere in the country, we want a little bit of the blood to add to our database. Just make sure to exonerate innocent people because the more samples we have, so some baby is born, they test the blood, a little blood goes in the database. You go to the doctor to have a glucose test or whatever, the doctor gives a little bit of your blood to the database, and the database gets bigger. Legitimate? Your Honor, I would say that there are big differences there. The main – again, we're not – What's that difference? That's why I said – No, I think – I mean, the main purpose of the law is not – is to combat recidivism, and it also has a benefit of protecting innocent people. We know that protecting innocent people involves excluding them from suspicion. And so if Congress is concerned about innocent people, it says the only way we're going to know not to come to your house, not to investigate you, not to knock on your door, is we have your blood, we test it, and then you're off the hook. We never have to bother you. And, you know, it's a big favor we're doing you. Would that justify – and the beauty of it is, and it's a really good system, is because they don't even have to go pierce your skin. You're already giving blood for some other purpose. Would that be okay? Well, I think that there's a significant difference there in that members of the general public – I think there's a significant difference there in that members of the general public have a robust expectation of privacy, that probationers simply do not. And I think that's – it's all – the Supreme Court has repeatedly emphasized that it's context. Context is critical. Would that violate the Fourth Amendment? I'm not prepared to take a position on that, but I think there's – I'm sorry. What you're telling me is that in the position of the United States, if Congress passed a statute requiring essentially every man, woman, and child in this country to give blood to its database, you don't know whether it would be constitutional? Do you think it might be constitutional with the Fourth Amendment? I think there would be different factors that the Court would have to consider. But it could be, right? It could be. It very well could be constitutional, and it gives you a closed case. Let me ask a question. Your Honor, again, I think it's – I mean, it's for this Court to decide, and it doesn't have to decide that issue here. If Congress passed a law that essentially required the giving of blood samples by every person in the United States, is that a statute the United States police would – would this be sort of a closed case? Well, I think no. I think it probably would. You're not prepared to say it would be unconstitutional? No, and I'm not prepared to say it would be constitutional. You don't have authority to, but it's a goofy position. It would be good to deter. Let me ask you about this statute. Okay. Is it technically open to us to say if we want to – if we think the law requires us to uphold the statute against this challenge, could we say that we reserve the question whether individuals have a right to bring an action to get their DNA records expunged from a database when they're no longer on supervised release? Could we reserve that question? I'm not asking you what the government's position is on that question. I have a feeling, you know, the government wouldn't want anything to happen to the database. No, I don't think you could. I don't see how it's separable. I mean, the issue is at the time the intrusion is being made, is it constitutional to make that intrusion for the purpose – for the purpose of creating this DNA identification profile that's going to go into a computer database? That's what's at issue here. I don't think you can separate it out. And I think that's the question. And as I was explaining before, an important thing to consider is that probationers, unlike the general public, do not have a reasonable expectation of privacy. Of course, the interest in a former probationer, the interest of someone who's no longer on suspended release isn't really before us in this case, right? That issue's not presented. Well, I guess it's not squarely presented. But again, I wouldn't separate – I don't see how you would separate the analysis. The statute as written retains it forever. Yes. It does. Yes. It goes into the CODIS database. You have to decide whether that statute as written is constitutional. Right. I think you do. But let me ask you this. You keep telling us what are not your theories of the case. Mm-hmm. In order to follow your theory of the case, do we have to find on the theory that essentially these parolees, using the term broadly, have that no suspicion is required whatsoever with these individuals? That's correct. Under the balancing of interest approach that we've set out, that's permissible, you know, after the Knight's decision, clearly. The Knight's decision leaves that question open is your position, correct? No, it doesn't leave open the issue of whether the Knight's case – no, it doesn't resolve the balancing in this case because that case involved the search of a home, a more intrusive search of a home, and that involved – implicates officer discretion and all that, which you don't have in this case because there's – the statute has all kinds of protections that eliminate any discretion both at the time of collection and also at the time of analysis. But – so I think that it doesn't determine the outcome of the balancing here, but it sets out an approach that makes clear that the approach the rise court took, the straightforward balancing approach, is permissible when you're dealing with law enforcement practices that infringe on people in the criminal justice system. Let me ask you about the balancing. Why, if this is such a wonderful way of deterring crime – you know, everybody who's a recidivist committed a first crime. We don't want to give them a free first strike. We'd like to deter all crime. Why, when you balance, wouldn't you say, as Judge Kuczynski asked, isn't it a good idea to have everybody's DNA unfiled for life so that none of the – no one will commit crimes anymore? Why doesn't the balance fall on that side? First of all, because – Is it because you have such a great privacy right and you're not having your blood taken? Because there is a big distinction that the Supreme Court has drawn between ordinary citizens and people in the criminal justice system. And what is an ordinary citizen's interest that so overwhelms this desire to eliminate crime? That you can't take DNA from – you can't take blood from the ordinary citizen, from the person arrested for a crime, from a person who commits a misdemeanor. Why are they protected? Because the Supreme Court has said that you can categorically regard people on probation as presenting a public safety risk, and you cannot do that with respect to ordinary citizens. That's a very significant difference. And that's why – I'm asking, what is the interest on the part of the ordinary citizen that overcomes this compelling governmental interest if we can deter all crime? Because the – first of all, the deterrence is not the key purpose. Again, it's the combating the recidivism. And the Supreme Court has said you can treat people differently on probation when they've committed a crime. You can assume they present more of a risk of committing another crime. And you can't make that assumption about people in the general public wherever they live or wherever they may come from. You can't make those assumptions. And so I think that's just a key distinction. It's all – the Supreme Court has emphasized it's the totality of the circumstances. And so when you do the balancing here, it turns on a number of factors. First, again, the blood draw not being a significant intrusion. Second, the substantially reduced expectations of privacy of probationers. Third, that all you're getting out of this sample is an identification profile. But my question was, if it's not a significant intrusion to have this done, and it's such an important law enforcement technique that we're going to deter crime, why is it that the balance is not in taking everybody's place? Because the intrusion is different. And what I'm trying to say is the intrusion is different with respect to a member of the general public and someone who's on probation. Someone on probation, just like the Court talked about in the Skinner case, you have to look at the context. You have people on probation who are subject to a variety of restrictions and infringements based on the State's reason to believe, justifiable reason to believe that they present a threat to public safety. But I gave you an easier case because I didn't say people are going to have to line up and give blood. Nobody's going to force you to give blood. You're already in the doctor's office. You're giving blood for some other purpose, which you could choose not to do for you. And all we're asking is a draw. All we're asking is whenever you give some blood in your normal, so this would be quite a bit less burden because you don't have to break the skin. You don't have to make a special appointment. Why wouldn't the balance be, and think about the benefit of acceleration. I mean, you'd be able to, you know, have a DNA and you wouldn't be suspected unjustly. Well, again, I think members of the public have more of a right to make that choice. And they don't have any reason to think that they don't. Isn't it really a practical matter? You know, if you had 300 million blood samples, what are you going to do with them? If you just draw blood, you go to a doctor and they draw blood. I have this. They do it all the time with me. And if they're going to use it for DNA sample, I have to draw more. But counsel. I mean, they need a certain quantity. Isn't that what you told us before? They need a process. It's similar to an amount you would get in a standard blood draw. Counsel, the intrusion here is not the taking the needle to get the blood. The intrusion is having a record of your genetic footprint or whatever the genetic word is that's stored in a government database so that whenever you do anything, they can mash up and find out whether it was you or not. Isn't that a huge intrusion? Well, I don't think it's a huge intrusion for someone who's been convicted of a crime. Right. But it is an intrusion for the ordinary person. Why does the State have any reason to want me in a database that's related to solving crimes? It's an intrusion for anybody. I haven't committed a crime. I've never been convicted of a crime. Why should the State intrude on my privacy in connection with facilitating the solving of crimes? But that's a very different calculus when you're talking about people in the criminal justice system, as the Supreme Court has said in Knight. On the issue of intrusion itself, what's the difference then between a fingerprint and the DNA sample? What precise differentiation is there in terms of intrusiveness? In terms of, again, the intrusiveness, the difference, as I said before, is only at the collection. The breaking of the skin to get the blood sample, to get the blood draw, to get bodily fluid, is more significant. Judge O'Scanlon's question is addressed to the intrusion that the Chief Judge was talking about. The point the Chief makes apparently is that there's something different about a DNA sample than there is from a fingerprint. And I want you to see the difference. No, no, again, the difference is only at the collection. I don't see the difference. In terms of what you end up with, it's the same. The fingerprint database that we have, the DNA profile database is the same. All it provides is reliable indicia of identification. There is no significant real difference between a fingerprint database and a DNA database that Congress has authorized. And as far as the ---- But Congress has authorized. But what the government possesses is more, in the case of a DNA base, than a fingerprint. Now, you will tell us that the law prevents any other use of it or any other development of it. But you've got it there, and you can't guarantee us what an Attorney General 20 years from now is going to do. He may not be as liberal and enlightened as our current Attorney General. Two points. First, there are restrictions. There are clear restrictions in the statute on improper use, disclosure of a sample. But the fact is the government possesses much more information, even though it's restricted by the statute from using it. You have given the government that information. Now, you know, we have a benevolent government now that doesn't use it. But they've got it if a less benevolent government comes along. Well, I would ---- you know, I'd point to the ---- I'd point this Court to the Court's decision in Skinner and Acton where the Court said we're not ---- we're going to look at what the rules provide, what they authorize. We're not going to assume the worst with respect to things that aren't addressed. And this statute is very specific that it only permits this system to be set up, this national DNA index system to be set up for law enforcement identification purposes. And it's very clear there are strict penalties for misuse or wrongful disclosure of a sample or a DNA test result. Let me ask you this. Once you get the sample, do you run it through to see whether all kinds of unsolved crimes in the past may have been committed by this person? The searches are run sort of automatically. There's a forensic database that has crime scenes. So that the crime scenes, I mean, are in the database. They're from prior crimes. And those are run against the convicted offender database. So, yes, someone could be implicated for a crime that occurred before they were entered into the database. That's correct. Now, you've articulated to justify constitutionally this. Could Congress require parolees to have a transponder of some kind inserted in their body so that we know where they are? The future Congress passed a law that said, you know, we've got this real problem, kidnappings of kids and all of this. We want to know where these people are. So from now on, if you're parolee convicted of these things, we're going to insert a transponder in your body so we know where you are all the time forever. Well, I think there might be a question of proportionality, whether that's really necessary to serve the purposes of probation. So I don't think it's that. I think there's a difference there. That wouldn't necessarily be constitutional. Counsel, you have used your time. Thank you. Thank you. Thank you. I think Mr. Reinhart is correct in terms of what the danger of this is, because the government possesses an enormous amount of information with these DNA samples. It is important to realize that unlike Skinner and Acton and those other cases where the samples were looked at for one thing and one thing only and then destroyed, under this statute the blood samples are kept forever. And it allows the ---- Fingerprints are kept forever. So you can still get caught for ---- Fingerprints, it's not about getting caught, Your Honor. It's fingerprints. Well, but don't they use those? I mean, every time they get fingerprints from a burglary, don't they run them through one of those systems to see if any of their ---- I assume that they do. But fingerprints, this is not a genetic fingerprint. This is not telling you solely who the person is that has been sampled. It is giving you access. It is giving the government access to a lot of other information. And the concept that what the government is testing or profiling on the DNA profile are junk sites is ridiculous. As the amicus briefs filed show, already these so-called junk sites tell the government things such as the race of the person. As high as the human genome ---- Excuse me. Why is that impermissible? Don't fingerprint cards and other booking information contain the race and other demographic information? The point I'm trying to make, Judge Silverman, is that as we advance in technology, these so-called junk sites are going to tell the government more and more about the person, including very private medical and genetic information about them. And that ---- it wasn't that long ago that all DNA were junk sites. We didn't know what they meant. Already we know this. What we already also know is that DNA taken for one purpose ends up already, and not just later when we may have a different government, being used for different purposes. DNA is taken from military personnel right now under the theory that we can identify battlefield remains. It is in CODIS. It is in the criminal law enforcement data bank. It was taken from military personnel for one purpose and now is being used for a different purpose. But they're not used for taking for one purpose and used for different purposes. When you get a driver's license in California, I assume in many other states, you give a fingerprint. I always have. I'm sorry. I didn't understand. When you get your driver's license in California, when you get it renewed, you give a fingerprint. Yes. It used to be they smudged your finger, but not anymore. It's done electronically. Sometimes you don't even know it's there. I gather that as law enforcement is looking for suspects for a crime, they can scan the database of the Department of Motor Vehicles and look at all of the thumbprints. Or is it done? I don't know. I'm not sure whether it is or not, but obviously there are lots of places in our society where we're forced to give up fingerprints. I mean, all of us had to do it to be admitted to the California bar. But we're lawyers. Pardon me? We're lawyers. We don't count. A lot of recidivism there, too. The government disavows special needs. But if they're going to disavow special needs, then we are into regular Fourth Amendment reasonableness. But the government can get the print, the thumbprint or the fingerprint or the handprint or whatever for a purpose, can legitimately get it. There's nothing that says they can't use it for something else. Well, they have to destroy it when they're done with it. Well, there may or may not be. The concept usually is that you've consented to giving it, and so it is limited to the scope of your consent. Counsel, you're tied. Thank you. The case just argued is submitted for decision. That concludes the Court's argument in this case. Any questions? All rise. Thank you.
judges: Schroeder, Pregerson, Reinhardt, Kozinski, O'scannlain, Hawkins, Silverman, Wardlaw, Gould, Clifton, Callahan, Cjj